UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

LONG ISLAND UNIVERSITY,

               Petitioner,               **MEMORANDUM & ORDER**
                                                                           **10 CV 2806 (DRH)(ETB)**

             - against -

C.W. POST COLLEGIAL FEDERATION,
*on behalf of* DR. JOELLE SAAD-LESSLER,

               Respondent.

--------------------------------------------------------X
**Appearances:**

**Fulbright & Jaworski, L.L.P.**
Attorneys for Petitioner
666 Fifth Avenue
New York, NY 10103
By:    Douglas Peter Catalano
         Meredith Anne Sharoky
         Neil G. Sparber

**Lena M. Ackerman**
Attorney for Respondent
New York State United Teachers
Office of General Counsel
52 Broadway, 9th Floor
New York, NY 10004

**HURLEY, District Judge:**

       Petitioner commenced this action as a petition to vacate an arbitration award ("Award") issued on May 12, 2010, pertaining to a decision by the Board of Trustees of Long Island University ("University", "LIU", or "petitioner") not to grant tenure to Dr. Joelle Saad-Lessler ("Saad-Lessler"), a faculty member in the University's Economics Department. The arbitration proceeding was conducted pursuant to the Collective Bargaining Agreement ("CBA" or

"Agreement") entered into between LIU and respondent C.W. Post Collegial Federation ("Union" or "Respondent"), Saad-Lessler's union.[1] Jurisdiction over this action exists under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, *et seq.*. Before the Court is the original petition, respondent's combined opposition and motion to confirm the arbitration award, and petitioner's opposition/reply. For the reasons that follow, LIU's petition is denied, and the Union's motion to dismiss that petition and to confirm the award of arbitration is granted.

## BACKGROUND

### I. SAAD-LESSLER'S EMPLOYMENT AND APPLICATIONS FOR TENURE

Saad-Lessler first became a member of the faculty of LIU's Economics Department at the C.W. Post campus during the 2001/2002 academic year. She was recommended for reappointment by her Department in each of the five academic years that followed. During the 2006/2007 academic year, the first year in which she would normally be eligible to apply for tenure, she took maternity leave. To accommodate her pregnancy, and at Saad-Lessler's request, the school stopped the tenure clock during that academic year and designated 2007/2008 as her first year of tenure eligibility. Saad-Lessler then applied for tenure at some point in late 2007.

The procedure for applying for tenure at LIU is governed by Article XII, Section 5 of the CBA. This section provides for a multi-step process in which the Department Personnel Committee ("DPC") and the Chairperson of the Department forward their recommendations to the Dean for review. The recommendations of the Dean, the DPC and the Campus Faculty Personnel Committee ("CFPC") are then all forwarded to the University President, who makes a final recommendation to the Board of Trustees. (CBA, Art. XII §5.)

---

[1] The collective bargaining agreement between LIU and the Union is attached to the Declaration in Support of Respondent's Motion to Dismiss ("Resp. Decl.") as Exhibit C.

In response to Saad-Lessler's 2007 application for tenure, the DPC, the Dean and the CFPC all recommended against tenure, citing her strong teaching skills, but ultimately concluding that she would need to increase her publishing efforts before they could favorably recommend her. Academic Vice-President Kane, acting on behalf of the University President, also recommended against her application, determining that she had not met the teaching or scholarship requirements for tenure. He noted that "her colleagues offer positive assessments of her teaching but her student evaluations give one cause for concern," and that at the time of her application, she had only one published, "refereed" article to her credit. (Opinion and Award of Arbitrator Janet M. Spencer dated May 12, 2010 ("Award") at 12.)

Saad-Lessler renewed her application the following year. At that point, she had four additional articles either published or accepted for publication in peer-reviewed journals. (Award at 13.) This time, the Department Chair, the DPC, the Dean, and the CFPC all concluded that Saad-Lessler had met the teaching and scholarship criteria and recommended that she be granted tenure. Kane, however, disagreed. He wrote that although her teaching and research activity had shown "good recent progress, . . . her record as a whole lacks the level of achievement as a researcher and as a teacher to merit tenure." (Award at 16-17.) He therefore declined to recommend her for tenure to the Board of Trustees, who ultimately decided against her application. Saad-Lessler's request for appointment for an additional "discretionary year" in 2009/2010 was also denied. Saad-Lessler then moved to arbitrate her denial under Article XXII, Section 4(c) ("section 4(c)") of the CBA.

## II. RELEVANT PROVISIONS OF THE CBA

The two portions of the CBA relevant to Saad-Lessler's arbitration proceedings are as follows:

1. *Article XII, Section 5 – Procedures for Determining Eligibility for Tenure*

    a) The responsibility for evaluating candidates for tenure shall rest with the Department Personnel Committee, the Department Chairperson, the Dean, the Campus Faculty Personnel Committee and the Administration.
    b) Every faculty member who meets the eligibility criteria shall receive fair and impartial evaluation by the appropriate committee(s), under previously authorized and published criteria appropriate to the discipline (as required by Article VI, Peer Evaluation -Faculty Personnel Committees).
    c) The tenure recommendations of the Departmental Personnel Committee and of the Chairperson shall be forwarded for review and recommendation to the appropriate Dean, whose recommendation shall be based on evidence of merit in the personnel file.
    d) The tenure recommendations of the Department Personnel Committee, the Chairperson and the Dean's recommendation shall be forwarded to the Campus Faculty Personnel Committee for review and recommendation. The Committee's consideration shall be based on evidence of merit in the personnel file and the department's and Dean's recommendations.
    e) The tenure recommendations of the Department Personnel Committee, the Chairperson, the Dean and the Campus Faculty Personnel Committee shall be forwarded to the President, who shall prepare the final recommendation for the Board of Trustees. The President and his/her designee shall meet with the Campus Faculty Personnel Committee to discuss any disagreement(s) with the Committee's recommendation(s) before the President's final recommendation is presented to the Board of Trustees. The President's recommendation shall be reasonably based on evidence of merit in the personnel file and institutional needs as they affect the determination of tenure.
    f) Board of Trustees' action on tenure recommendations shall be reasonably based on the evidence of merit in the personnel file, institutional needs as they affect the determination of tenure, and the faculty and Administration judgments stated in the recommendations.

(CBA at 56-58.)

2. *Article XXII, Section 4(c)*

    Arbitrability of any grievance involving appointment, reappointment, promotion, or tenure shall be limited solely to procedural issues. The Arbitrator shall not be authorized to review the merits of the academic

judgment of the faculty and Administration or substitute his/her judgment therefor.

(CBA at 138-39.)

## III. THE ARBITRATION AWARD

On May 12, 2010, the appointed Arbitrator, Janet M. Spencer, Esq., issued an opinion and award resolving the following issues stipulated by the Union and LIU: "Whether Long Island University failed to grant tenure to Dr. Joelle Saad-Lessler in violation of the collective bargaining agreement. If so, what shall the remedy be?" (Award at 1.) The Arbitrator held that the University did, in fact, violate the CBA in denying Saad-Lessler tenure, but instead of reversing the University's decision, the Arbitrator directed Saad-Lessler to be appointed for a position in the Economics Department for one "discretionary year" beginning in September 2010. (Award at 24.)

As set forth above, under section 4(c) of the CBA, the arbitration of any grievance involving decisions of tenure is limited "solely to procedural issues." The Arbitrator – cognizant of this circumscribed standard of review – held that Kane's assessments of Saad-Lessler's teaching and scholarship were both "flawed procedurally" and were therefore in violation of the CBA. The procedural flaws detailed in the Award are outlined below.

### a. Procedural Flaws Pertaining to Kane's Assessment of Saad-Lessler's Teaching

Kane's recommendation regarding tenure conceded that Saad-Lessler's peers made "glowing" assessments of her teaching ability throughout her time at LIU, but noted that her "[s]tudent evaluations . . . exhibit below average scores on key questions such as instructor's effectiveness." (Award at 16, 21.) The Arbitrator juxtaposed Kane's observations with a portion

of Article VI of the CBA, which provides that the evaluations of faculty members rest "'principally' with his/her peers." The Arbitrator thereafter concluded that Kane's analysis was procedurally flawed because it gave "predominant, indeed dispositive, importance to student evaluations" and largely disregarded the evaluations of her peers. (Award at 21.)

The Arbitrator also found procedural fault with regard to Kane's particular method of assessing student evaluations. Whereas the DPC and the Dean compared the "median responses" in student evaluations of Saad-Kessler with those of other faculty members in the Economics Department, Kane on the other hand compared "answers to key questions in Dr. Saad-Lessler's student evaluations with those in student evaluations in the college of arts and sciences or even in the university as a whole." (Award at 22.) The Arbitrator reasoned that Kane was aware of how the DPC and the Dean reviewed and analyzed student evaluations of Saad-Lessler, and that the DPC, the Dean and Saad-Lessler had no reason to believe that Kane would employ a different "standard of review." (Award at 22.) According to the Award, this "[l]ack of notice and transparency as to the standards of review that will be applied throws the fairness of the tenure review process, as mandated by Article XII, Section 5(b), into question." (Award at 22.)

### b. Procedural Flaws Pertaining to Kane's Assessment of Saad-Lessler's Scholarship

Regarding Kane's analysis of Saad-Lessler's research and publication activity, the Arbitrator expressed concern over (1) "the lack of notice," and (2) "the abrogation of Saad-Lessler's legitimate expectations." (Award at 22.) The text of the Arbitrator's decision was careful not to pass judgment on Kane's ultimate conclusions regarding Saad-Lessler's scholarship endeavors. Rather, the Arbitrator took aim at the events leading up to Kane's recommendation.

6

In a letter to Saad-Lessler following his initial denial of her application for tenure, Kane advised that she "speak with [her] chair and dean to discuss possible ways of strengthening [her] application so that [she] might be a successful candidate for tenure next year." (Award at 13.) Saad-Lessler did just that. A letter from Professor Gafar, a representative from the DPC, wrote: "The Committee encourages Dr. Saad-Lessler to publish her research in 'well established' journals indexed in the Journal of Economic Literature or the Social Science Index." (Award at 23.) The Dean stated in her denial of Saad-Lesser's first application for tenure that "should she meet with better success in getting some articles published or in press by the time of her next tenure review, her application would certainly warrant a more favorable response." (Award at 23.)

The Arbitrator opined that in directing Saad-Lesser to seek the advice of her Department and of the Dean, Kane "knew or should have known" what these individuals would advise her, and that Kane "directed Dr. Saad-Kessler in his [denial letter] to rely on that advice." (Award at 23.) Saad-Lessler then renewed her tenure application the following year after having made further progress in her publishing efforts. With this backdrop, the Award held that Kane's denial of tenure to Saad-Lessler "implicit[ly] repudiate[ed]" his previous advice "without notice," and in doing so, changed the "standards that would have to be met" in violation of the CBA.

## DISCUSSION

### I. STANDARD OF REVIEW

"Judicial review of a labor-arbitration decision pursuant to [a CBA] is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Major League*

*Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)(citing *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36 (1987)); *see Burns Int'l Sec. Servs., Inc., v. International Union, United Plant Guard Workers & Local 537*, 47 F.3d 14, 17 (2d. Cir. 1995)(per curiam)(A party to a CBA "is not entitled to have the arbitrator's decision overturned simply because the arbitrator did not adopt its interpretation of the contract."). "[A] reviewing court is bound by the arbitrator's factual findings, interpretation of the contract and suggested remedies," *Local 97, Int'l Brotherhood of Elec. Workers v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 124 (2d Cir 1999). Even where the arbitrator presents only "a barely colorable justification for the outcome reached," the award must be upheld. *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 526 (2d Cir. 2005)(quotes and citation omitted).

"Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Where the arbitrator's decision strays from "the essence of the collective bargaining agreement," or "manifest[s] an infidelity to this obligation," the Court must vacate the award. *Id.*

Notwithstanding the Court's highly deferential standard of review, the Court "may not enforce a collective-bargaining agreement that is contrary to public policy." *Niagara Mohawk*, 196 F.3d at 125. Vacating an arbitration award on such grounds, however, must be based on "laws and legal precedents and not from general considerations of supposed public interest." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1963)(citation omitted).

## II. THE PARTIES' CONTENTIONS

The parties dispute whether the arbitrator acted within her authority, and whether her decision "draws its essence from the collective bargaining agreement." *See Enterprise Wheel*, 363 U.S. at 597. Primarily, the issue is whether the arbitrator limited her review "solely to procedural issues" as prescribed under section 4(c) of the CBA, or whether her conclusions actually substituted the academic judgment of Kane by rendering substantive determinations. The details of each side's position are set forth below.

### a. LIU

The University alleges in the original petition and argues in its opposition to the Union's motion that although the Arbitrator couched her perceived defects in Kane's analysis in terms of procedural matters, she in fact made a substantive determination of the merits of the denial of Saad-Lessler's tenure. According to the University, it complied with each one of the procedural provisions set forth in the CBA (see Article XII, Section 5 of the CBA excerpted above) and that the Arbitrator's decision failed to identify any those procedures to which the school did not adhere. The University argues that the following conclusions by the Arbitrator, characterized in the decision as addressing only procedural matters, were in fact considerations of substantive issues and therefore outside the ambit of the Arbitrator's limited review:

- "It is clear, that, in evaluating her teaching effectiveness, Dr. Kane gave predominant, indeed dispositive, importance to student evaluations." (Pet. Memo at 2.)
- "It is clear that the DPC and the Dean at most compared the student evaluations of Dr. Saad-Lessler with those of other faculty in the Economics Department. From this perspective, Dr. Saad-Lessler's student evaluations were consistently more than acceptable, even superior throughout her teaching career -- with one exception -- in her sixth year, there was some drop-off in the level of her positive student evaluations in core courses -- though not in her higher level courses. Notably, the level of positive student evaluations rebounded in Dr. Saad-Lessler's core courses the following year." (*Id.*);

- "Dr. Kane compared answers to key questions in Dr. Saad-Lessler's student evaluations with those in student evaluations of faculty in the college of arts and sciences or even in the University as a whole." (*Id.*)
- "Lack of notice and transparency as to the standards of review that will be applied throws the fairness of the tenure review process, as mandated by Article XII, Section 5 (b), into question." (*Id.*); and
- Since Dr. Kane knew or should have known what the Chair and the Dean would advise her, and directed Dr. Saad-Lessler in his April 23, 2008 [letter] to rely on that advice, Dr. Kane's implicit repudiation of this advice by, without notice, changing the standards that would have to be met, was procedurally unfair in violation of Article XII, Section 5 (b)." (*Id.*)

The University further contends that the Arbitrator "incorporated notions of 'fairness' to create a procedural violation that was not contained in the CBA," and in doing so arrived "at a substantive determination by disagreeing with Dr. Kane's recommendation." (Pet. Memo at 3.) Although, the University notes, that Article XII, section 5(b) of the CBA requires every member under consideration for tenure to "receive a fair and impartial evaluation . . . under previously authorized and published criteria," the Arbitrator "utilize[d] 'fairness' as a substantive judgment rather than as a procedural determination." (Pet. Memo at 11.) Specifically, petitioner charges that the Arbitrator "considered the weight that Dr. Kane gave to student evaluations as compared to peer reviews," (Pet. Memo at 12), even though Article VI, Section 2(c) provides that "teaching effectiveness should be evaluated by considering peer and student evaluations." (Pet. Memo at 13.)

As to the Arbitrator's determinations regarding Saad-Lessler's publishing and scholarship work, petitioner argues that although Kane recommended that Saad-Lessler seek advice from her Dean and Department Chair on how to improve her chances in subsequent applications, "neither of these persons could, or did, guarantee that Dr. Saad-Lessler would be granted tenure if she published 'more' articles, nor did anyone advise her that if she published a certain amount of articles she would receive tenure." (Pet. Memo at 15.) These recommendations also, according

to the University, could not have affected the "formal criteria, standards or procedures for tenure." (Pet. Memo at 15.)

Finally, petitioner argues that the Arbitrator's decision was contrary to a "strong" public policy that "a school 'may not bargain away any of its decision making responsibilities which are concerned with the maintenance of classroom standards.'" (Pet. Memo at 21 (quoting *Brighton Cent. Sch. Dist. V. Brighton Teachers' Assoc.*, 505 N.Y.S.2d 522, 523 (Monroe Cnty. 1986)).

### b. The Union

The Union argues that the Arbitrator's decision rested purely on the procedural infirmities of Kane's recommendation, and therefore was within the authority of the Arbitrator as prescribed by the CBA. This argument is advanced through citation to case law which limits the Court's review of an arbitrator's interpretation of the CBA. *See, e.g., Misco,* 484 U.S. at 38 ("[A]s long as the arbitrator is arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."); *see also Wackenhut Corp. v. Amalgamated Local 515,* 126 F.3d 29, 31-32 (2d Cir. 1997)("[A]n arbitration award must be upheld when the arbitrator 'offers even a barely colorable justification for the outcome reached' The contractual theory of arbitration . . . requires a reviewing court to affirm an award it views as incorrect – even very incorrect – so long as the decision is plausibly grounded in the parties' agreement.")

The Union asserts that "once a party has participated in arbitration, the courts are prohibited from passing upon the merits of the arbitrated dispute . . . ." (Resp. Memo at 17.) Here, the Union argues, the Arbitrator did not exceed her authority because she based her decision on "3 separate procedural violations that tainted the review of Saad-Lessler's teaching and her scholarship," (Resp. Memo at 18), *viz.*:

1. Kane's analysis gave "dispositive" effect to student evaluations of Saad-Lessler's teaching performance, even though the CBA requires such considerations to rest "principally" on peer evaluations;
2. As detailed above, Kane differed in the manner in which he analyzed the student evaluations, as compared to the methods employed by the DPC, CFPC, and Dean; and
3. Kane "repudiated" his advice to Saad-Lessler that she seek direction from the Department chair and the Dean on how to improve her application for tenure, and by doing so "without notice, altered the standards to be met for tenure."

The Union reiterates its position that these matters are procedural by referring to the following excerpt from the Arbitrator's decision:

> where the difference between [Kane] and the DPC is not over whether the candidate for tenure had met established criteria, but over what criteria she should have met, the issue sounds in procedure, not academic judgment.

(Resp. Memo at 21 (citing Award at 20).)

Finally, the Union argues that the University's claim that the Arbitrator's decision was not contrary to public policy should fail because petitioner fails to identify an "explicit" or "well-defined and dominant" public policy. (Resp. Memo at 23 (quoting *W.R Grace.*, 461 U.S. at 766).)

## III. ANALYSIS

### a. The Scope of the Arbitrator's Authority

The Court "must determine first whether an arbitrator acted within the scope of [her] authority, and second whether the award draws from its essence from the agreement or is merely an example of the arbitrator's own brand of justice." *Local 1199, Hosp. & Health Care Emples. Union v. Brooks Drug Co.*, 956 F.2d 22 (2d Cir. 1992). "An arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers." *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990). "If the reviewing court then determines that the arbitrator has derived his authority from sources outside the collective bargaining agreement, [her] award cannot stand." *Id.* at 66.

The Court disagrees with the University's contention that the Arbitrator's award is insufficiently tethered to the CBA to pass muster. That argument rests on the problematic proposition that the Arbitrator's role was "strictly limited" to, in essence, whether each of the six procedural steps listed in Section 5, Article XII was undertaken, presumably independent of the manner in which the various reviewing individuals and entities performed their respective roles. (See Pet.'s Reply Mem. at 6.) The notion that such reviews were intended to be devoid of considerations linked to procedural fairness is belied by, *inter alia*, language in the subject listing instructing that "[e]very faculty member . . . meet[ing] the eligibility criteria shall receive [a] fair and impartial evaluation by the appropriate committee(s)." CBA, Art XII, § 5(b). Clearly, the parties to the CBA meant for the term "procedural issues" as used in Article XXII, Section 4(c) to be more broadly construed than the University contends, *viz.* consistent with general parlance. Indeed, if the parties had intended a narrower definition, they could have, and likely would have,

defined "procedural issues" to include only the procedural steps listed in Article XII, Section 5. The parties, however, chose not to so limit the definition, and the Court will not read such a narrow meaning into the Agreement.

The University also argues that the Arbitrator weighed in on substantive matters by passing judgment on the "fairness" of Kane's determination. The University, however, mischaracterizes the Arbitrator's treatment of the principle of "fairness" in her decision. All of the Arbitrator's references to the "fairness" of the result – of which there are only three in her discussion – are derived from Article XII, Section 5(b), which, as excerpted above, requires that "[e]very faculty member who meets the eligibility criteria shall receive a fair and impartial evaluation by the appropriate committee(s)." In all three instances, the Arbitrator's conclusions clearly relate to this provision and incorporate notions of "fairness" only to the extent that they speak to matters of procedure. In fact, the second reference specifically states that Kane's examination was "procedurally unfair in violation of Article XII, Section 5(b)." (Award at 23.) The University's suggestion that the Arbitrator determined in general terms "whether the grievant had somehow been treated 'fairly' or 'unfairly'" is not an accurate portrayal of the Award.

The University further argues that the Arbitrator at times "seized upon the term 'fair' in Article XII . . . to expand her review to substantive issues." (Resp. Memo at 11.) To the extent that the University argues that the Arbitrator's purportedly substantive determinations were masquerading as procedural matters, the Court will address this issue in the sections that follow.

Finally, the University argues that while the deferential "draws its essence" standard may apply to the Court's review of the Arbitrator's contract interpretations, it does not apply to the separate *a priori* consideration of whether the Agreement conferred the authority upon the Arbitrator to act in the first place. In other words, the University argues, it is axiomatic that the

"scope of an arbitrator's authority is not left for the arbitrator to decide; rather, courts make those judgments after careful examination of the parties contractual arbitration provision." (Resp. Memo at 8.) While the Court need not necessarily rely on the Arbitrator's own determination whether a matter is procedural and within the ambit of her authority, the flaws identified in Kane's denial are all arguably procedural and the Arbitrator did not "derive[] [her] authority from sources outside the collective bargaining agreement." *Leed*, 916 F.2d at 66.

### b. Teaching Evaluation

The Court turns next to the Arbitrator's analysis of Kane's determinations regarding Saad-Lessler's teaching. The Award identifies two procedural flaws in Kane's assessment. First, as stated above, the Arbitrator criticized Kane for giving "predominant, indeed dispositive, importance to student evaluations," where the evaluation should have rested "principally with his/her peers." (Award at 21.) However, the Arbitrator's criticism quotes the CBA somewhat out of context.

The Arbitrator here pulls from Article VI, Section 1(a) of the Agreement, which states that the "responsibility for the evaluation of the credentials, performance, and professional activities of all faculty rests principally but not exclusively with their peers."[2] The key word from that excerpt is "responsibility," indicating that it is faculty members (as opposed to, perhaps, administrators or students) who are in charge of evaluating other faculty members. The section of the CBA from which this quote is taken goes on to detail at length the procedures by which faculty members are evaluated by their peers for purposes of appointment, reappointment, promotion, or tenure. (*See* Article VI *generally.*) The Arbitrator read this provision not to

---

[2] Article VI is entitled "PEER EVALUATION – FACULTY PERSONNEL COMMITTEES." As stated in section one of the Article, the "fundamental purpose of faculty evaluations shall be to encourage and facilitate the improvement of individual professional performance." (CBA at 11.)

prescribe "peer evaluation" as a "responsibility" or preferred method of assessment, but rather as part of the criteria by which one is evaluated. Thus, according to the Award, when balancing student evaluations with faculty evaluations in determining one's qualifications for tenure, the weight should fall "principally" on the faculty evaluations. However, the CBA is essentially silent on whether to assign greater weight to student or faculty evaluations, but does indicate that faculty evaluations provide "*a* basis for decisions on . . . tenure" (Article VI, section 1(a), CBA at 12), and elsewhere that "[t]eaching effectiveness [is] attested to by peer *and* student evaluation(s)," (Article VI section 2(c)(1), CBA at 14).

In its present review, the Court is mindful of its charge not to substitute its judgment for the Arbitrator's interpretation of the CBA, "even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong." *Local 1199, Hosp. & Health Care Emples. Union v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992). However, an arbitrator may also not duck review by a district court "simply by making the right noises – the noises of contract interpretation. *Leed Architectural Products, Inc. v. United Steelworkers, Local 6674*, 916 F.2d 63,65 (2d Cir. 1988).

Though the Court may find fault with the Arbitrator's interpretation in this area, the Arbitrator's rationale was nevertheless grounded in provisions of the Agreement, and the Court does not sit to second guess that interpretation. The University argues again that the Arbitrator here treaded into substantive areas by, in essence, dictating the relative weight that Kane must give student and teacher evaluations of Saad-Lessler. (Resp. Memo at 11-12.) Her determination, however, was based on a view that the evaluation criteria set forth in the CBA mandated assigning primary weight to faculty evaluations. From there she reasoned that the CBA precluded any assessment that gave "dispositive" effect to negative student evaluations,

16

and virtually ignored the faculty evaluations. Such a conclusion is different from ruling on the relative weight that Kane should have given to the two sets of criteria. The Arbitrator's approach merely determined what criteria must be considered under the CBA and what criteria may not be discarded. As the Arbitrator noted in the beginning of her discussion, "where the difference between [Kane] and the DPC is *not* over whether a candidate for tenure has met the *established* criteria, but over what criteria she *should* have met, the issue sounds in procedure, not academic judgment." (Award at 20 (emphasis in original.)  Though the Court may disagree with the reasoning that led to such a conclusion, it is not in a position to vacate the award based on a difference of opinion.

The Arbitrator also found "procedural anomalies" in the method that Kane used to analyze the student evaluations. As the Arbitrator's decision notes, Article XII, Section 5(b) of the CBA mandates that eligible candidates for tenure "shall receive fair and impartial evaluation by the appropriate committee(s), under previously authorized and published criteria appropriate to the discipline." (Award at 22 (citing Section 5(b).) Presumably, the Arbitrator interpreted "previously authorized and published criteria" to encompass the method that the DPC and the Dean applied when reviewing Saad-Lessler's student evaluations, before Kane employed a different approach. By changing the "standard of review" pertaining to student evaluations, without notice and at the final stage of the application process, the Arbitrator held, Kane threw the "fairness of the tenure review process, as mandated by Article XII, Section 5(b) into question." (Award at 22.) Though the University may dispute whether the CBA provides such specific procedures of review, the Arbitrator did not exceed her authority in coming to such a conclusion, and the result reasonably draws its essence from the Agreement.

### c. Scholarship

Regarding Kane's treatment of Saad-Lessler's record of publishing and scholarship, the Arbitrator found similar procedural flaws. Specifically, the Arbitrator reasoned that the criteria by which Saad-Lessler would be judged in her second application for tenure was first established through Kane's suggestion that she "speak with [her] chair and dean to discuss possible ways of strengthening [her] application so that [she] might be a successful candidate for tenure next year." (Award at 22.) In viewing this advice to Saad-Lessler, the Arbitrator opined that Kane "knew or should have known" what the subsequent advice from the Dean and the DCP would be,[3] and that Kane had, in effect, "directed" her to "rely on that advice" thereby establishing the evaluative criteria. (Award at 23.) In the eyes of the Arbitrator, when Kane later determined that Saad-Lessler had not met the standards of scholarship necessary to grant tenure, Kane retroactively redefined the criteria for appointment set by the DPC and the Dean.

The Arbitrator's conclusion that by referring Saad-Lassler to seek the advice of the DPC and Dean he had laid the groundwork for what would become established evaluative criteria is at best a "stretch."  The Arbitrator's approach here essentially hamstrings Kane – who conceivably suggested in good faith that Saad-Lessler heed the advice of the Dean and DPC – to accept the suggestions of the Dean and the DPC as an intractable and compulsory framework by which he must later evaluate Saad-Lessler for tenure. Surely, this is not a result contemplated by either party to the CBA.[4]

---

[3] The DPC's and Dean's letters to Saad-Lessler before she re-applied for tenure (1) "encourage[d]" Saad-Lesser to "publish her research in 'well established' journals," and (2) stated that should she meet with "better success" in her publishing efforts, "her application would certainly warrant a more favorable response." (*See* Award at 23.)

[4] Also noteworthy is that the CBA actually provides for such feedback to denied applicants, but does not ascribe any precedential value to such feedback. (*See* Article VI, Section 1(a) (Upon the request of any faculty member who has received a negative evaluation, the DPC must convene to (1) :"enumerate[e] in writing the individual's deficiencies," and (2) "provid[e] guidance for improved performance . . . .").)

18

Nevertheless, the Arbitrator's interpretation, as flawed as it may be, is just that: an interpretation. The relevant language and logic of the Award is sufficiently tethered to provisions in the CBA, it regularly cites the portions of the Agreement from which its conclusions are derived, presents a "colorable justification" for its interpretation, and in the end, "draws its essence" from the CBA. On this front, the Award is careful to cabin its criticism of Kane's considerations of Saad-Lessler's scholarship to a procedural matter (*i.e.* that Kane "without notice, chang[ed] the standards that would have to be met") and the Arbitrator's conclusion that these "procedural improprieties taint" Kane's ultimate determination is rational. Limited to a review of whether the Arbitrator's decision is grounded in the CBA, the Court declines to vacate the Award based on Kane's denial of tenure to Saad-Lessler for purportedly inadequate scholarship achievement.

### d. Public Policy

Finally, the Court turns to petitioner's argument that the Award violates the "strong" public policy that "a school 'may not bargain away any of its decision making responsibilities which are concerned with the maintenance of classroom standards.'" (Pet. Memo at 21 (quoting *Brighton*, 505 N.Y.S.2d at 523).) On this point, the University argues that "[b]ecause Arbitrator Spencer reviewed the merits of L.I.U.'s decision, she removed the power of the University to determine whether a candidate qualifies for tenure in violation of a well-defined public policy." (Resp. Memo at 22.) Setting aside whether this policy is sufficiently "well defined and dominant," for present purposes, *see W.R. Grace*, 461 U.S. at 766, petitioner's argument is premised on the assumption that the Arbitrator "reviewed the merits of L.I.U.'s decision." As discussed *supra,* the Arbitrator limited her review to procedural, not substantive matters, and did not review the merits of the University's decision. Furthermore, the Award did not grant Saad-

Lessler tenure, it merely permitted her to return for an additional "discretionary year." *See IBEW, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998)("[A] court's task in reviewing an arbitral award for possible violations of public policy is limited to determining whether the award itself, as contrasted with the reasoning that underlies the award, creates [an] explicit conflict with other laws and legal precedents and thus clearly violates an identifiable public policy.")(citing *Misco*, 484 U.S. at 43)(internal quotes omitted). The Court therefore denies the University's petition to vacate the Award as contrary to public policy.

## CONCLUSION

For the above reasons, the Court denies the petitioner's application to vacate the subject Award, and grants respondent's motion to dismiss the petition and confirm the Award. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Central Islip, New York
September 27, 2011

　　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　Denis R. Hurley
　　　　　　　　　　　　　　　　　　　　Unites States District Judge